IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 3, 2018

## IN RE JUSTIN P., ET AL.

**Appeal from the Chancery Court for Moore County**
**No. 136A     J. B. Cox, Chancellor**

_____

**No. M2017-01544-COA-R3-PT**

_____

This is a termination of parental rights case. Appellant/Mother appeals the trial court's termination of her parental rights on the ground of: abandonment by willful failure to visit. Appellant also appeals the trial court's finding that termination of her parental rights is in the children's best interests. Because Appellee/Father thwarted Appellant's attempts to visit the children, we conclude that Appellees failed to meet their burden to show, by clear and convincing evidence, that Appellant abandoned the children. Accordingly, we reverse the order terminating Appellant's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Jonathan C. Brown, Fayetteville, Tennessee, for the appellant, Kathryn P.

Melissa L. Thomas, Fayetteville, Tennessee, for the appellees, Dennis P. and Rebecca P.

## OPINION

### I. Background

Appellant Kathryn P. ("Mother") is the mother of J.L.P. (d/o/b August 1997), K.R.P. (d/o/b August 1998), D.C.P. (d/o/b/ October 2001), and M.J.P. (d/o/b September 2010) (together, the "Children").[1] Dennis P. ("Father") is the Children's father. Mother

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

and Father were divorced on September 4, 2013. Father has since remarried to Rebecca P. (together with Dennis P., "Appellees").[2]

In connection with their divorce, Mother and Father entered into a permanent parenting plan for the Children. In relevant part, the plan designates Father as the Children's primary residential parent and grants Mother 140 days per year of visitation. The plan also includes a "special provision," stating that: "The parties will not consume alcohol and/or drugs in the presence of the minor children. If mother begins drinking or becomes abusive during residential sharing, the children may call the father to pick them up."

On April 10, 2015, Appellees filed a motion to terminate Mother's parental rights on the ground of abandonment by willful failure to visit.[3] The petition stated that Mother last visited the Children "in the month of August of 2014." On May 1, 2015, Mother filed an answer, wherein she denied the material allegations of the petition. The trial court appointed a guardian ad litem by order of September 13, 2016. A hearing was held on March 27, 2017. The trial court set out its findings of fact in a memorandum opinion entered on April 17, 2017. On July 3, 2017, the trial court entered its order terminating Mother's parental rights on the sole ground of abandonment by willful failure to visit. We note that, by the date of the hearing in this case, the two older children, J.L.P. and K.R.P., had reached the age of majority. Accordingly, the trial court's order terminates Mother's parental rights only as to the younger children, D.C.P. and M.J.P. As such, Mother's parental rights *vis-à-vis* J.L.P. and K.R.P. are not the subject of this appeal. Mother appeals only the termination of her parental rights as to D.C.P. and M.J.P.

## II. Issues

Appellant raises two issues for review as stated in her brief:

1. Whether the Appellees proved by clear and convincing evidence that the Appellant failed to support, visit and/or abandoned the minor child for four (4) consecutive months preceding the filing of the termination petition as defined by Tenn. Code Ann. § 36-1-102(1)(A)(i).

2. Whether there is sufficient evidence to support the trial court's finding that termination of parental rights is in the best interest of the minor children.

---

[2] Appellees did not file a responsive brief in this appeal.
[3] The petition also avers abandonment by willful failure to support. The trial court found that this ground was not met, and Appellees have not appealed this ruling.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. ***Nash-Putnam***, 921 S.W.2d at 174-75 (citing ***Santosky v. Kramer***, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re W.B***., Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. July 12, 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Abandonment by Willful Failure to Visit

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of abandonment by willful failure to visit pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) and Tennessee Code

Annotated Section 36-1-102(1)(A)(i). In pertinent part, Tennessee Code Annotated Section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36–1–102, has occurred . . .

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part, as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians . . . have willfully failed to visit . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i).

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tennessee Code Annotated Section 36-1–102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months immediately preceding the filing of the petition to terminate his or her parental rights. In *In re Audrey S.*, this Court discussed willfulness in the context of termination of parental rights cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require

- 4 -

malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvert. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005 (internal citations and footnotes omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. Ct. App. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). As previously discussed, this Court reviews questions of law de novo with no presumption of correctness. *Id.*

In its memorandum opinion, the trial court made the following, relevant findings concerning Mother's abandonment by willful failure to visit:

12. [Mother] was entitled to 140 days a year of residential sharing pursuant to the Permanent Parenting Plan.
13. After the children had reported to [Father] that [Mother] had endangered them with her conduct related to her drinking, [Father] unilaterally stopped her visitation.
14. [Father] later offered [Mother] supervised visitation to occur at a public place, and this visitation occurred for only a short period and then ceased when [Mother's] relatives behaved inappropriately.
15. [Mother] has not seen the children since that time.
16. [Mother] last visited the children in August of 2014.
17. [Mother] came to the oldest two children's graduations.
18. [Mother] had the ability to visit with the children.
19. [Mother] has not taken [Father] back to court to obtain residential sharing time.

Although Mother does not dispute that she last visited the Children in August of 2014, she argues that her failure to visit was not willful because her efforts were frustrated by Father. In response to Mother's allegation that Father thwarted her visitation, the trial court made the following, relevant findings:

- 5 -

[Mother] complains that she has been obstructed and prohibited from visiting the children by [Father]. However, the proof does not bear out this assertion. While it is true that the Father unilaterally curtailed [Mother's] visitation without the benefit of a court order and without going back to court to solidify his rights by way of an order, he did not totally eliminate [Mother's] opportunity to visit with her children. To the contrary, Father extended the opportunity to visit with the children in a controlled supervised setting. At first [Mother] did visit with the children under this arrangement. However, when her family caused a scene and disrupted the visitation which caused the Father to terminate the visit, [Mother] never again attempted to visit with the children . . . . She clearly had the ability to visit the children. She made a knowing choice not to visit. She was a free agent in this choice.

[Father] did not go about limiting [Mother's] residential time in the most legally expedient way, and he should have obtained a court order to limit her time. However, even the parenting plan gave him the right to curtail the visitation if the children perceived that [Mother's] drinking was a problem. Basically, that is what he did. The children were in danger and he protected them from [Mother]. Even then [Father] tried to cooperate and offered [Mother] residential sharing with supervision for the children. [Mother] and her family messed up the opportunity, intimidated and physically pressured the oldest child, and behaved in a manner that Father should have terminated residential sharing. Further attempts at supervised residential sharing were refused by the mother. The Court is clearly convinced that [Mother] had the opportunity to [visit] with supervision and willfully refused to visit under those conditions. Further, [Mother] did not go back to Court to obtain sharing time with the children.

Indeed, this Court has held that

[f]ailure to visit ... is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to ... develop a relationship with the child[.]

*In re Muir*, No. M2004-02652-COA-R3-CV, 2005 WL 3076896 (Tenn. Ct. App. Nov. 16, 2005) (internal citations omitted). When applying this standard, we have stated:

Conduct that amounts to a significant restraint or interference with a parent's efforts to support or develop a relationship with a child includes (1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting

a parent's efforts to visit the child.

*In re S.M.*, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004) (citing *In re S.A.B.*, 735 So.2d 523, 524 (Fla. Dist. Ct. App. 1999)).

As set out in context above, the trial court found that "even the parenting plan gave [Father] the right to curtail the visitation if the children perceived that [Mother's] drinking was a problem." The parenting plan, which was admitted into evidence as Trial Exhibit 4, actually provides:

> The parties will not consume alcohol and/or other drugs in the presence of the minor children. If Mother begins drinking or becomes abusive during residential sharing, the children may call the Father to pick them up.

Contrary to the trial court's finding, this special provision does not give Father the right, without court approval, to unilaterally stop Mother's visitation, nor does it give Father the authority to convert her unsupervised visitation to supervised visitation and then to use her failure to visit as a ground to terminate her parental rights. Rather, the parenting plan provision simply gives Father the right to pick the Children up early from visitation if Mother is drinking and the Children call him. Turning to the record, although Mother conceded that she abused alcohol during her marriage to Father, she testified that she no longer drinks. The Children's respective testimony corroborates Mother's statement. When asked, "Did your mom drink while y'all were over there," J.L.P., the oldest child, testified, "Not that I know of, no." The oldest daughter, K.R.P., was asked whether Mother "continue[d] to drink when you went over there," and she answered, "Not that I know of." Likewise, D.C.P. testified, in relevant part, as follows:

> Q. Okay. Now, did she drink in front of you at that house?
>
> A. No.
>
> Q. Okay. Did you ever feel threatened by anyone, that you were going to be hurt or harmed while you were there?
>
> A. No.
>
> Q. Were you able to call your dad at any point while you were there?
>
> A. Once.

D.C.P. further testified that he did not know why his Father stopped his visits with Mother. Both J.L.P. and K.R.P. testified that neither had ever called Father to be picked up from visits at Mother's home. Rather, K.R.P. testified that:

- 7 -

Q. . . . You know there's nothing in the visitation order to stop visitation. You understand that?

A. Yes.

Q. And that your dad basically quit letting y'all go; is that right?

A. It wasn't his decision. He didn't let us quit.

Q. Okay.

A. We told him that we didn't want to go back there.

Q. So he was letting y'all make the decision?

A. I mean, it was kind of half and half.

Q. So half dad saying that you don't have to go and half you saying that you're not going.

A. He said that if we didn't want to go, we didn't have to go.

During his testimony, Father readily admitted that he stopped Mother from visiting the Children. Specifically, he testified:

Q. And in that parenting plan, the mother was given 140 days and you were given 225 days, correct?

A. Yes.

***

Q. And that was—visitation was happening from August 7, 2013, until when?

A. It would have been the end of July of '14.

Q. And why did it stop?

A. Because when they came back from that two weeks that we had, the alternate two weeks over the summer, and when they came back from that two weeks, there were things going on that were brought to my attention,

- 8 -

and I just felt that it was not safe for them to be there unsupervised . . .

***

Q. So what you did when you didn't feel safe, then you came back to the courthouse, you filed something to get her supervised visitation?

A. No.

Q. You've never been back to court, have you?

A. No, sir.

Despite Father's admission that he stopped Mother's visitation without first seeking to modify the parenting plan through legal channels, the trial court appears to place the onus of litigation on Mother. As set out above, the trial court decision to terminate her parental rights was based, in part, on its finding that "[Mother] has not taken [Father] back to court to obtain residential sharing time." This Court has previously held that an adoption agency's position that the biological parent "litigate if he [or she] desired to develop a relationship with [the] child" was a substantial restraint on the parent's efforts to maintain a relationship with the child and the interference excused the biological parent's failure to visit. *In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Accordingly, the fact that Mother did not seek visitation through court intervention should not weigh against her.

The trial court also faults Mother for not agreeing to Father's unilateral decision to convert her court-granted, unsupervised visitation to supervised visitation. As set out in context above, the court found that Father "tried to cooperate and offered [Mother] residential sharing with supervision for the children. [Mother] and her family messed up the opportunity, intimidated and physically pressured the oldest child, and behaved in a manner that Father should have terminated residential sharing." There is nothing in the record to establish Father's authority to make the determination for supervised visitation. Furthermore, the trial court also appears to fault Mother for the actions of her family members. While the record reveals that Mother's family members made certain offensive hand gestures toward Father at a park where Mother was to exercise visitation, under Father's supervision, it is not clear that Mother engaged in this behavior. As Father stated in his testimony: "[Mother's] aunt and cousin would be in the car behind us yelling obscenities at us and flipping us the bird through the windows and stuff like that . . . ." The bad acts of others in her family should not weigh against Mother.

The Tennessee Supreme Court has held that a parent who attempts to visit and maintains a relationship with the child, but is "thwarted by the acts of others and circumstances beyond [her] control," cannot be found to have willfully abandoned the

child. ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007); ***In re F.R.R., III,*** 193 S.W.3d 528, 530 (Tenn. 2006). However, as noted above, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn.2009) (citation omitted). Thus, a parent's failure to visit is willful when it is "the product of free will, rather than coercion." ***In re Audrey S***., 182 S.W.3d at 863. Turning to the record, there is evidence that, even after Father refused to allow the Children to visit Mother, she continued to call Father's house to speak with them. Father testified, in relevant part, that:

> Q. And how many times has she called you and asked to talk to the kids and you haven't let the kids return her call?
>
> A. I don't know that there has been.
>
> Q. You don't—[Mother's] never called you since you quit letting her have visitation?
>
> A. She's called a few times.
>
> Q. Okay. And did she talk to the kids?
>
> A. She talked to them a few times, yes . . . . I let them talk to her a few times when she was—when she called. And then after I told her that we could do a supervised visitation on weekends, and then she told me that she wasn't going to do that and then quit corresponding.

J.L.P. also testified that Mother would call Father's house "like once a week I guess, twice a week maybe," and the Children would talk with her. Mother testified that, since that time, Father has blocked her from calling his cellular telephone. In addition to the attempted telephone communication, it is undisputed that Mother attended the high school graduations of the two older children. Pictures of these events, showing Mother with the Children, were admitted into evidence.

From the totality of the circumstances, we conclude that the evidence shows an effort on part of the Appellees to interfere with Mother's right to see her Children or to communicate with them. As a result, there is much animosity between Mother and the Appellees. The Tennessee Supreme Court has held that antagonism between biological parents and legal guardians may excuse a failure to visit. ***See In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007) ("Where, as here, the parents' visits with their child have resulted in enmity between the parties . . . the evidence does not support a 'willful failure to visit' as a ground for abandonment."). By virtue of the parenting plan, the

Appellees were clearly aware that Mother had been awarded reasonable, unsupervised visitation rights with the Children, and their unilateral decision to stop visitation, or only to allow Mother access to the Children when Father was present, has created "a significant restraint or interference with [Mother's] attempts to visit the [C]hild[ren]." *In re M.L.P*., 281 S.W.3d at 393. Accordingly, we conclude that the evidence does not clearly and convincingly establish that Mother has abandoned these Children by willful failure to visit. Having determined that the sole ground for termination of Mother's parental rights is not met, we do not reach the issue concerning the Children's best interests.

## V. Conclusion

For the foregoing reasons, we reverse the trial court's order terminating Appellant's parental rights to D.C.P. and M.J.P. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellees, Dennis P. and Rebecca P., for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE